**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal Action No. 12-150 (JEB)** |
| **KEVIN HUSSAIN HOMAUNE,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

Defendant Kevin Homaune and his former wife Jodi Reed have one daughter. In the summer of 2009, when Homaune and Reed were estranged but not divorced, the two agreed that he could take their child to Iran for six weeks to visit his family, then bring her back to Reed in the United States. Instead, Homaune and his daughter lived in Iran for more than two years despite Reed's continued protestations. As a result, he was charged with violating the little-used International Parental Kidnapping Crime Act, which proscribes retaining a child abroad (who has been in the United States) with the intent to obstruct a parent's lawful exercise of physical-custody rights.

Homaune has now filed two separate Motions to Dismiss, asserting that his prosecution suffers from a litany of defects. The constitutional complaints: Congress lacked the power to pass the statute, delays in the prosecution violated his right to a speedy trial, the law gave no fair warning that his conduct was illegal, and the bare Indictment ran afoul of the Fifth and Sixth Amendments. The statutory complaints: Homaune's alleged conduct did not actually violate the statute, the delay between his arrest and his arraignment flouted the Speedy Trial Act, and the Court should at least order a bill of particulars. Although the cornucopia of objections here might suggest a kitchen-sink approach, these objections are in fact uniformly reasonable and

weighty.  At the end of the day, however, the Government has the better of each argument.  The Court will therefore deny Homaune's Motions.

## I.     Background

While the Motions here focus on legal questions arising from the Indictment, the Court begins with a brief overview of the facts (undisputed, except as noted) to orient the reader.  The ensuing procedural-background section will frame the speedy-trial analysis.

### A.  Factual Background

Homaune – a dual citizen of Iran and Canada – met Reed online while he was living in Canada.  After Reed – an American citizen who lived near the Canadian border – became pregnant, the couple married in May 2002.  Their daughter M.H. was born in November 2002.

Homaune and Reed stopped living together in February 2003.  Although the couple never made formal legal arrangements to settle custody, M.H. remained with her mother while Homaune worked as a truck driver.  M.H. and Reed eventually settled in Virginia.  Reed sponsored Homaune's successful application for a Green Card so that he could regularly visit M.H.  Usually he visited every few weeks, but at times the gaps between visits would stretch to months.  When M.H. grew older, Homaune and M.H. sometimes took weekend- or week-long vacations together without Reed.

Reed and Homaune agreed to a longer excursion in 2009.  With Reed's blessing, Homaune took M.H. to Iran on May 29, 2009, to meet his family.  Homaune and Reed settled on a six-week trip, meaning that Homaune should have returned from Iran with M.H. on July 9.  But Homaune and M.H. did not return then – or for the next two years.  The parties' explanations for this lapse diverge.  According to the Government, Homaune planned to keep M.H. and raise her in Iran.  According to Homaune, Iranian officials barred him and M.H. from leaving the country.  Who is correct will ultimately be determined at trial.

While Homaune and M.H. were in Iran, Reed obtained a custody order in 2010 from the Circuit Court for the County of Albemarle, Virginia, granting her full legal and physical custody of M.H. until further order of the Court. She also obtained an order of divorce from the same court.

In August 2011, Homaune traveled to Turkey with M.H., where they planned to meet Reed. (The parties disagree about whether Homaune intended to let M.H. return to the United States with Reed or simply to let M.H. visit with Reed in Turkey.) After he crossed the border, Turkish officials detained Homaune and returned M.H. to Reed.

B. Procedural Background

The Government filed a Sealed Criminal Complaint against Homaune on October 28, 2010, and secured an arrest warrant on November 1. It then sought and obtained a Red Notice from the international police organization INTERPOL, asking other countries to arrest Homaune so that the United States could extradite him.

Homaune was first detained in this case when he crossed into Turkey around August 4, 2011. According to Homaune, Turkish authorities held him for three nights. He claims that he was never told about an American warrant for his arrest or pending charges against him in the United States. The Government's efforts to extradite Homaune while he was in Turkey failed, although Homaune questions the competence of those efforts. Homaune returned to Iran about a week after he had arrived in Turkey.

Homaune next popped up in Germany on May 20, 2012. German officials again detained Homaune pursuant to the INTERPOL Red Notice, and the United States sought extradition the next day. This time, Homaune apparently learned of the charges. The parties agree that Homaune waived objections to extradition on May 24. According to the Government, however, he tried to revoke his waiver around June 5, forcing a German court to hold a hearing. Around June 11, the German court found his waiver irrevocable. German authorities transferred custody

of Homaune to the U.S. Marshals Service in Germany on June 28. That same day, a Grand Jury in this District returned an Indictment charging him under the International Parental Kidnapping Crime Act. On June 29, 2012, Homaune was arraigned here, and he remains detained pending trial of this matter.

## II.    Analysis

The one-count Indictment charges Homaune with international parental kidnapping, in violation of 18 U.S.C. § 1204. That statute provides:

> (a) Whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both.
> (b) As used in this section –
>> (1) the term "child" means a person who has not attained the age of 16 years; and
>> (2) the term "parental rights", with respect to a child, means the right to physical custody of the child –
>>> (A) whether joint or sole (and includes visiting rights); and
>>> (B) whether arising by operation of law, court order, or legally binding agreement of the parties.

According to the Government, Homaune retained M.H. (who has been in the United States) in Iran with the intent to obstruct Reed's lawful exercise of parental rights. See Indictment, June 28, 2012.

The Court's analysis will begin with sections covering Defendant's challenges to the Indictment itself: Congress's authority under the Commerce Clause to enact such a law (Section A), whether Homaune's actions here can constitute a crime (Section B), and whether the Indictment is sufficient (Section C) or requires a bill of particulars (Section D). The Court will then move to Defendant's arguments about the delay before trial (Section E), coving claims under both the Speedy Trial Act (Section E.1) and the Sixth Amendment (Section E.2).

A.  Commerce Clause

Homaune claims at the outset that Congress lacks the power to criminalize "retaining a child outside the United States with the described *mens rea*." Def. Mot. to Dismiss Indictment at 7.  He emphasizes that 18 U.S.C. § 1204 relates to family law and child custody, areas "where States historically have been sovereign." United States v. Lopez, 514 U.S. 549, 564 (1995).  Homaune's description of the crime, however, omits a key element: that the defendant "retains a child (who has been in the United States) outside the United States" with the described *mens rea*. 18 U.S.C. § 1204(a) (emphasis added).  That parenthetical jurisdictional hook saves the statute under the Foreign Commerce Clause.

The Federal Government holds limited powers, and Congress can act only if the Constitution enumerates a power that authorizes its action.  The sole congressional power that the Government relies on to defend § 1204 is the Commerce Clause.  The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.  The Foreign Commerce Clause is at least as broad as the more familiar Interstate Commerce Clause.  See Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 448 (1979) ("Although the Constitution, Art. I, § 8, cl. 3, grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater.").

In Lopez, the Supreme Court listed "three broad categories of activity that Congress may regulate" under its interstate commerce power:

> First, Congress may regulate the use of the channels of interstate commerce.  Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come

only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

514 U.S. at 558-59 (citations omitted); see also Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2578 (2012).

If Congress defines a crime so that every violation fits in one of those three categories, the Commerce Clause empowers Congress to enact the statute. In striking down the Gun-Free School Zones Act of 1990, the Lopez Court noted that the Act "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." 514 U.S. at 561. The Court drew a contrast to the statute in United States v. Bass, 404 U.S. 336 (1971), which similarly punished firearm possession (this time, by a felon) but added that the possession must be "in commerce or affecting commerce." See Lopez, 514 U.S. at 561-62 (quoting Bass, 404 U.S. at 337). The Court later interpreted the Bass felon-possession statute again in Scarborough v. United States, 431 U.S. 563 (1977), this time to decide "what would constitute an adequate nexus with commerce." Id. at 568. The Court concluded that the statute required only a "minimal nexus" to interstate commerce: "that the firearm have been, at some time, in interstate commerce." Id. at 575. In other words, "proof that the possessed firearm previously traveled in interstate commerce is sufficient to satisfy the statutorily required nexus between the possession of a firearm by a convicted felon and commerce." Id. at 564. Although Scarborough spoke in the language of statutory interpretation, it relied heavily on the constitutional reasoning from Bass.

In reliance on those Supreme Court cases, every circuit – including the D.C. Circuit – has held after Lopez that a jurisdictional hook "substantially identical" to the one in Bass and Scarborough satisfies the Commerce Clause. See Fraternal Order of Police v. United States, 173

F.3d 898, 907-08 & n.2 (D.C. Cir. 1999) (collecting cases). Other circuits, moreover, have uniformly concluded that the reenacted Gun-Free School Zones Act satisfies the Commerce Clause because Congress added a new jurisdictional hook requiring the firearm to have "moved in or . . . otherwise affect[ed] interstate or foreign commerce." 18 U.S.C. § 922(q)(2)(A); see United States v. Nieves-Castaño, 480 F.3d 597, 602 (1st Cir. 2007) (*dicta*); United States v. Dorsey, 418 F.3d 1038, 1046 (9th Cir. 2005), overruled on other grounds, Arizona v. Gant, 556 U.S. 332 (2009); United States v. Danks, 221 F.3d 1037, 1039 (8th Cir. 1999).

Here, § 1204 requires the child retained abroad to have "been in the United States." As the Ninth Circuit noted in upholding § 1204, the statute "implicitly and unavoidably requires movement in foreign commerce": "The parenthetical clause ensures that prosecution under the statute occurs only if the child has first been moved <u>from</u> the United States <u>to</u> another country." United States v. Cummings, 281 F.3d 1046, 1051 (9th Cir. 2002) (emphasis in original). Under Lopez, "Congress is empowered to regulate and protect . . . persons or things in [foreign] commerce, even though the threat may come only from [foreign] activities." 514 U.S. at 558. Like the guns in Scarborough and Bass, all children covered by § 1204 are "persons . . . in [foreign] commerce." See Scarborough, 431 U.S. at 575 (statute requiring "minimal nexus" to interstate commerce – "that the firearm have been, at some time, in interstate commerce"). And § 1204 regulates or protects those children. Section 1204 thus represents a valid exercise of Congress's Foreign Commerce Clause power.

B. Failure to Assert a Crime

Homaune's most forceful objection is that he could not "inten[d] to obstruct the lawful exercise" of Reed's "parental rights" within the meaning of 18 U.S.C. § 1204 by retaining M.H. in Iran because he never actually violated Reed's parental rights. (The Government makes no

suggestion that Homaune's intent existed separately from his keeping M.H. in Iran, so the inquiries are the same.)  Under Federal Rule of Criminal Procedure 12(b)(3), he claims that his indictment therefore "fails . . . to state an offense."

To repeat, § 1204 defines "the term 'parental rights', with respect to a child," as "the right to physical custody of the child – (A) whether joint or sole (and includes visiting rights); and (B) whether arising by operation of law, court order, or legally binding agreement of the parties."  The parties, in accord with every court that has opined on the issue, agree that these parental rights arise from the state where the child lived before leaving the United States – here, Virginia.  See United States v. Fazal-Ur-Raheman-Fazal, 355 F.3d 40, 45 (1st Cir. 2004); United States v. Amer, 110 F.3d 873, 878 (2d Cir. 1997).  So the question here is whether Homaune could obstruct Reed's right to physical custody under Virginia law by retaining M.H. in Iran.

Two appeals in other circuits raised similar questions: Amer in the Second Circuit and Fazal-Ur-Raheman-Fazal in the First.  Like here, the parents in those cases had stopped living together but never divorced or legally separated.  See Fazal-Ur-Raheman-Fazal, 355 F.3d at 43; Amer, 110 F.3d at 876.  And like here, the fathers in those cases were accused of violating the mothers' parental rights under § 1204 by taking the children out of the country.  Although admittedly not bound by this extra-Circuit authority, the Court finds their reasoning persuasive.

In Amer, New York law established the parental rights.  Amer claimed that § 1204 was unconstitutionally vague for a variety of reasons, including because the parental rights allegedly obstructed were not sufficiently defined.  The Second Circuit disagreed:  "[T]here is no confusion under New York law that Mona, as the biological mother, enjoys the right to physical custody of her children unless and until this right is terminated by law."  Amer, 110 F.3d at 878 (citing In re Michael B., 604 N.E. 2d 122, 127-28 (N.Y. 1992)).

Massachusetts law governed in <u>Fazal-Ur-Raheman-Fazal</u>.  The First Circuit made sure to

> note at the outset an undisputed fact: <u>under Massachusetts law</u>,
> Raheman did nothing criminal.  In <u>Commonwealth v. Beals</u>, 405
> Mass. 550, 541 N.E.2d 1011, 1015 (1989), the Supreme Judicial
> Court made clear that "a parent who has taken his or her children
> from the other parent <u>before there was any court proceeding</u> cannot
> be convicted of parental kidnapping under Mass. Gen. L. ch. 265,
> § 26A." (emphasis added).  Since Raheman removed his children –
> residents of Massachusetts – prior to such a proceeding, he could
> not have been convicted of kidnapping under state law.

<u>Fazal-Ur-Raheman-Fazal</u>, 355 F.3d at 44 (emphasis in original) (footnote and brackets omitted).

As the court stressed, however, Congress may criminalize conduct that is legal under state law.

<u>See</u> <u>id.</u>  In § 1204, the First Circuit concluded, Congress did just that:  "Congress could have

provided for the imprisonment of any person who, <u>in violation of State law</u>, removes a child

from the United States.  It did not do so, and this court will not infer such a limitation where the

statutory language does not support it."  <u>Id.</u> at 45 (emphasis in original).  Because the

Massachusetts Supreme Judicial Court had "expressly recognized 'the principle that, prior to a

court order, <u>both</u> parents have lawful custody of their children,'" the First Circuit concluded that

the father's removal of the children violated § 1204.  <u>Id.</u> at 46 (emphasis in original).  The court

also rejected the defendant's argument that § 1204 could not be violated when a parent is

"exercising their own rights under state law," saying that "so long as Ali [the mother] had

'parental rights' – a term encompassing even mere visitation rights – Raheman [the father] was

not permitted to take the children outside the United States with the intent to obstruct those

rights."  <u>Id.</u> at 46-47.

Here, Homaune raises many similar objections, except under Virginia law.  Homaune

particularly points to <u>Taylor v. Commonwealth</u>, 537 S.E. 2d 592 (Va. 2000), which considered

whether an unmarried father can kidnap his son.  While <u>Taylor</u> held that "upon birth of an

<u>illegitimate</u> child, the right of the natural mother to immediate custody is superior," <u>id.</u> at 595

(emphasis added), the implication was that for <u>married</u> parents, the lower court was correct and "if no custody proceedings are then pending, the natural parent acts with 'legal justification'" in taking the child from the other parent. 507 S.E. 2d 89, 93 (Va. Ct. App. 1998). That matches the rule in most states. <u>See</u> William B. Johnson, Annotation, <u>Kidnapping or Related Offense by Taking or Removing of Child by or Under Authority of Parent or One in Loco Parentis</u>, 20 A.L.R. 4th 823, § 2(a) (1983 & Supp. 2012). Indeed, in Massachusetts a parent cannot be convicted before a court issues a custody order. <u>See</u> <u>Fazal-Ur-Raheman-Fazal</u>, 355 F.3d at 44 & n.3 (parallel requirement in Massachusetts kidnapping statute that defendant take child "without lawful authority"). Yet the First Circuit still found a violation of § 1204 in identical circumstances: "That IPKCA looks to state <u>family</u> law for purposes of defining 'parental rights,' does not in any way suggest that the statute depends upon state <u>criminal</u> law to delineate the realm of circumstances through which such rights are transgressed." <u>Id.</u> at 45 (emphasis in original) (citation omitted). As the First Circuit persuasively explained, the absence of state kidnapping liability provides little help to a defendant charged under the IPKCA.

Homaune also takes on Virginia family law, arguing that nothing in Virginia law – no case or statute or regulation – shows that one married parent has a right to physical custody of the child *vis-à-vis* her spouse absent a court order. In other words, Homaune claims that Reed had no right to demand custody of M.H. when M.H. was in his care. The argument has some superficial appeal, since the best citation of Virginia law that the Government can rummage up is a statute making all parents (married and unmarried) "the joint natural guardians" of their child "with equal legal powers and legal rights with regard to such child, provided that the parents are living together, are respectively competent to transact their own business, and are not otherwise unsuitable." Va. Code § 64.2-1700 (formerly Va. Code § 31-1). (The Government also cites an

irrelevant statute defining "parent" for purposes of the article of the Virginia Code on special education.  See Va. Code § 22.1-213.1.)

Yet the Court need not worry that it is asking such a statute to bear more weight than it can support – for the simple reason that the principle embedded is so obvious: absent a court order, both married parents have a right to physical custody of their child.  In the First and Second Circuits, such custody rights ended the inquiry.  See Fazal-Ur-Raheman-Fazal, 355 F.3d at 46 ("In Beals, the Supreme Judicial Court expressly recognized 'the principle that, prior to a court order, both parents have lawful custody of their children.'") (emphasis in original) (ellipsis omitted); Amer, 110 F.3d at 878 ("there is no confusion under New York law that Mona, as the biological mother, enjoys the right to physical custody of her children unless and until this right is terminated by law").  Because one married parent retaining a child in Iran would obstruct the other parent's physical custody right in Virginia, the Indictment states an offense.

Section 1204, it should be recalled furthermore, requires only the intent to "obstruct" the other parent's physical custody rights, "whether joint or sole."  The statute focuses on the rights of the parent deprived of custody, not the rights of the parent with the child.  And no state family law right need be violated – just obstructed.  In the Court's view, whenever a parent with physical custody rights is unwillingly cut off from her child, that parent's rights to physical custody are "obstructed."

As a fallback position, Homaune claims that the uncertainties of Virginia law mean he had insufficient notice that retaining M.H. in Iran would violate the IPKCA, and thus a prosecution here violates due process (or, as Homaune puts it, the statute is unconstitutionally vague).  Justice Holmes explained this right in 1931:

> Although it is not likely that a criminal will carefully consider
> the text of the law before he murders or steals, it is reasonable that

a fair warning should be given to the world in language that the
common world will understand, of what the law intends to do if a
certain line is passed.  To make the warning fair, so far as possible
the line should be clear.

McBoyle v. United States, 283 U.S. 25, 27 (1931).  Here, however, the line imposed by § 1204

was clear, demarcated by the statutory text and decisions by two circuit courts.  Like the Fazal-

Ur-Raheman-Fazal and Amer courts, the Court concludes that the Defendant here had sufficient

notice that federal law prohibited his conduct.

　　　C.  Sufficiency of the Indictment

　　　Relatedly, Homaune claims that his bare-bones Indictment needs more meat.  In full, his

Indictment reads:

> Beginning on or about July 9, 2009, and continuing until in or
> about August, 2011, in the District of Columbia and elsewhere
> outside the District of Columbia, KEVIN HUSSAIN HOMAUNE
> did knowingly retain M.H., a child (who had been in the United
> States) outside the United States with intent to obstruct the lawful
> exercise of parental rights of Jodi Reed, the mother of said child.
> 　　　(International Parental Kidnapping, in violation of Title 18,
> United States Code Section, 1204)

Indictment, June 28, 2012.  According to Homaune, the Indictment improperly parrots 18 U.S.C.

§ 1204 in violation of Federal Rule of Criminal Procedure 7(c) ("The indictment or information

must be a plain, concise, and definite written statement of the essential facts constituting the

offense charged"), the Fifth Amendment right to indictment by a Grand Jury, and the Sixth

Amendment right "to be informed of the nature and cause of the accusation."  He particularly

complains that the Indictment gives no clear description of what "lawful exercise of parental

rights" he allegedly intended to obstruct.

　　　The Supreme Court has explained that "an indictment is sufficient if it, first, contains the

elements of the offense charged and fairly informs a defendant of the charge against which he

must defend, and, second, enables him to plead an acquittal or conviction in bar of future

prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974). Although "an indictment parroting the language of a federal criminal statute is often sufficient, there are crimes that must be charged with greater specificity." United States v. Resendiz-Ponce, 549 U.S. 102, 109 (2007); see also Hamling, 418 U.S. at 117 ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'") (citation omitted).

The Court in Hamling approved an indictment alleging "obscenity" because the "legal definition of obscenity does not change with each indictment; it is a term sufficiently definite in legal meaning to give a defendant notice of the charge against him." 418 U.S. at 118. The Court likewise recently upheld an indictment for attempted illegal reentry that never separately alleged an overt act toward completing the crime because "the word 'attempt' . . . encompasses both the overt act and intent elements." Resendiz-Ponce, 549 U.S. at 107. "Indeed," the Court noted, "the time-and-place information [in the indictment] provided respondent with more adequate notice than would an indictment describing particular overt acts." Id. at 108. On the other hand, the Court has rejected an indictment that charged the defendant with refusing to answer a question pertinent to a congressional inquiry without specifying what the inquiry was: "the very core of criminality under 2 U.S.C. § 192 is pertinency to the subject under inquiry of the questions which the defendant refused to answer. What the subject actually was, therefore, is central to every prosecution under the statute." Russell v. United States, 369 U.S. 749, 764 (1962). By omitting the subject of the inquiry at issue, the indictment in Russell failed to give the defendant notice as to how he allegedly violated the law.

Here, the situation is far closer to <u>Hamling</u> and <u>Resendiz-Ponce</u> than to <u>Russell</u>. While the "lawful exercise of parental rights" might seem nebulous in the abstract, the phrase actually has a fixed legal meaning like "obscene" or "attempt": "the term 'parental rights', with respect to a child, means the right to physical custody of the child – (A) whether joint or sole (and includes visiting rights); and (B) whether arising by operation of law, court order, or legally binding agreement of the parties." 18 U.S.C. § 1204(b)(2). The parties agree that Virginia family law determines the content of those rights. The Indictment here, moreover, tells Homaune whose rights he allegedly violated ("Jodi Reed") and when he violated those rights ("[b]eginning on or about July 9, 2009, and continuing until in or about August, 2011"). Indeed, the Indictment was sufficiently definite to enable the parties to write lengthy briefs debating the content of those allegedly violated parental rights and to allow the Court to write the previous Section resolving that question. Despite its parroting, the Indictment here thus "fairly informs a defendant of the charge against which he must defend." <u>Hamling</u>, 418 U.S. at 117.

In the alternative, Homaune asks the Court to import the recent civil pleading standards from <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), into the requirements for criminal indictments. Importing those standards, however, would upend previous Supreme Court decisions like <u>Hamling</u> and <u>Resendiz-Ponce</u>. The Supreme Court has warned lower courts that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997) (brackets omitted). Even if <u>Twombly</u> and <u>Iqbal</u> applied to indictments, moreover, there is nothing implausible in the Indictment here, so Homaune would not gain from their application.

D. <u>Bill of Particulars</u>

Under Federal Rule of Criminal Procedure 7(f), "[t]he court may direct the government to file a bill of particulars."  Bills of particulars fill many of the same roles as indictments.  "A bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges."  <u>United States v. Mejia</u>, 448 F.3d 436, 445 (D.C. Cir. 2006) (quoting <u>United States v. Butler</u>, 822 F.2d 1191, 1193 (D.C. Cir. 1987)).  A defendant is supposed to move for a bill of particulars "within 14 days after arraignment or at a later time if the court permits."  Fed. R. Cr. P. 7(f).  Moreover, "if the requested information is available in some other form, then a bill of particulars is not required."  <u>Butler</u>, 822 F.2d at 1193.

Here, Homaune moves for a bill of particulars that will answer three specific questions.  <u>See</u> Def. Mot. to Dismiss Indictment, Exh. A ("Particulars Sought")).  His motion fails twice over.  First, the motion came fifty-two days after arraignment – far beyond Rule 7(f)'s fourteen-day default – with no explanation for why his request took so long to lodge.  Second, in its brief, the Government actually responded to the questions that Homaune asked.  <u>See</u> Gov't Opp. to Mot. to Dismiss Indictment at 28-29.  The Court will hold the Government to its representations.  Although the Government's brief may have provided less complete answers than Homaune wanted, the information he requested is now largely "available in some other form," <u>Butler</u>, 822 F.2d at 1193, providing an independent reason to deny Homaune's motion for a bill of particulars.

E.  Speedy Trial

Homaune next complains that his prosecution has been delayed too long.  The timeline

for a criminal prosecution is controlled by both the strict tabulation of days under the Speedy

Trial Act and the broad, flexible standards under the Sixth Amendment Speedy Trial Clause.

Homaune claims that the Government violated both regimes here.  He thus moves to dismiss the

Indictment under Federal Rule of Criminal Procedure 48(b) based on the "unnecessary delay."

1.  *Speedy Trial Act*

The Speedy Trial Act requires that "[a]ny information or indictment charging an

individual with the commission of an offense shall be filed within thirty days from the date on

which such individual was arrested or served with a summons in connection with such charges."

18 U.S.C. § 3161(b).  In counting those thirty days, certain periods of delay "shall be excluded."

18 U.S.C. § 3161(h).  Excluded delays include:

- "delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure," § 3161(h)(1)(E);

- "delay resulting from transportation of any defendant from another district, or to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable," § 3161(h)(1)(F);

- "delay resulting from the absence or unavailability of the defendant or an essential witness," including when "his whereabouts cannot be determined by due diligence," when "his whereabouts are known but his presence for trial cannot be obtained by due diligence," or when "he resists appearing at or being returned for trial," § 3161(h)(3); and

- a catchall for delay from a continuance "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  § 3161(h)(7).

The remedy for such a violation is dismissal of the charges in the complaint, which can be with

or without prejudice.  See 18 U.S.C. § 3162(a)(1).

Here, Homaune agrees that he was "unavailab[le]" within the meaning of § 3161(h)(3) while he was in Iran and in his first days in Germany before he waived objections to extradition. Still, he counts forty-three days between his arrest and the indictment: seven days in Turkey from August 4 to August 11, 2011, and thirty-six in Germany (and then the United States) from May 24 to June 29, 2012. He therefore claims that § 3162(a)(1) mandates dismissal. Even accepting Homaune's timeline, however, both arrests that he claims started the speedy-trial clock were by foreign authorities – first Turkish and then German. The Court agrees with the Government that only an arrest by U.S. federal authorities triggers the Speedy Trial Act.

The Eleventh Circuit once observed that "[t]here is scanty case law on the meaning of the word 'arrest' under the Act." United States v. Shahryar, 719 F.2d 1522, 1524 (11th Cir. 1983). Almost three decades later, that observation still holds. Few cases actually raise the situation we have here, in which one sovereign arrests a defendant at the behest of the Federal Government solely to facilitate the Federal Government's bringing federal charges. Far more often, courts consider arrests by state authorities on state charges. Those cases establish that the Speedy Trial Act comes into play only if the arrest is for a federal offense, but they say little about the repercussions of state authorities effecting the arrest. See United States v. Mills, 964 F.2d 1186, 1193 (D.C. Cir. 1992) (en banc) ("we reaffirm Robertson and hold that only an arrest in connection with federal charges triggers § 3161(b) of the Speedy Trial Act") (emphasis in original). Indeed, courts often blend whether the arrest was for a federal offense with whether the arrest was by federal authorities, using the term "federal arrest" to cover both situations. To avoid confusion in this Opinion, the Court will avoid the "federal arrest" label.

One of the few cases that did face the issue presented here was United States v. Rezaq, 899 F. Supp. 697 (D.D.C. 1995), an opinion by then-Judge Royce C. Lamberth. There, foreign

officials detained the defendant before he was turned over to the FBI to face federal charges. Judge Lamberth concluded that "[f]ederal arrest requires a federal deprivation of liberty, and such deprivation cannot occur until the defendant is turned over to federal authorities." Id. at 705 (emphasis in original) (internal quotation marks omitted). Judge Lamberth thus found as a matter of law that the defendant had no viable Speedy Trial Act defense. Three aspects of the structure of the Speedy Trial Act lead the Court here to the same conclusion.

First, the Speedy Trial Act concerns the federal administration of justice and overwhelmingly regulates federal actors. The Act "mandate[s] an orderly and expeditious procedure for federal criminal prosecutions by fixing specific, mechanical time limits within which the various progressions in the prosecution must occur." United States v. Taylor, 240 F.3d 425, 427 (4th Cir. 2001) (emphasis added) (citation omitted). The doctrine of dual sovereignty "recognizes that the federal government is not bound by the actions of state authorities." Shahryar, 719 F.2d at 1525; see also id. ("Common sense, as well as deeply rooted concepts of federalism dictate that the Speedy Act rules relate only to federal and not to state custody."). In the same way, the Federal Government is not bound by the actions of foreign authorities. While the Speedy Trial and Due Process Clauses of the Constitution protect a defendant against prosecution after abuses by other sovereigns, the Speedy Trial Act generally focuses on actions inside the federal system.

Second and relatedly, the Speedy Trial Act's teeth come from threatening the sovereign – that is, the Federal Government – with dismissal in cases of unsanctioned delay. But those teeth have no bite for foreign actors. When the Government cannot control the actors, the justification for the Act's harsh deterrence disappears.

Finally, some portions of the Speedy Trial Act would be hard to explain if an arrest by foreign authorities started the Act's clock. Indeed, the Act would have a gaping hole. Transfers between federal districts pause the Act's tally of days, as the Act excludes "delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure." 18 U.S.C. § 3161(h)(1)(E) (emphasis added). Similarly, the Act excludes "delay resulting from transportation of any defendant from another district," except that "any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable." 18 U.S.C. § 3161(h)(1)(F) (emphasis added). Yet the Act never mentions transfers of custody from foreign authorities to the Federal Government – even though delays from those transfers are sure to stretch far longer. The omission makes sense only if the Speedy Trial Act clock does not run when foreign authorities arrest a defendant.

Other courts have sometimes worried that leaving state arrests for state crimes out of the Speedy Trial Act could give federal authorities an incentive to cheat: "[F]ederal criminal authorities could arrange with state authorities to have the state authorities detain a defendant until federal authorities are ready to file criminal charges." United States v. Benitez, 34 F.3d 1489, 1494 (9th Cir. 1994). To prevent that from happening, some courts have allowed the Act to be "triggered by state detentions that are merely a ruse to detain the defendant solely for the purpose of bypassing the requirements of the Act." Id.; see also United States v. Woolfolk, 399 F.3d 590, 596 & n.7 (4th Cir. 2005) (adopting broad ruse exception). But not the D.C. Circuit. The en banc Circuit instead concluded that the protection against such ruses comes from the Due Process Clause. See Mills, 964 F.2d at 1192 ("If a defendant showed that the U.S. Attorney deliberately arrested him on D.C. charges and secured a Superior Court indictment in order to

gain time to gather additional evidence for a federal prosecution, he might have a valid due process claim for pre-indictment delay."). There may be a similar objection here that carving out arrests by foreign authorities will let the Government end-run the Speedy Trial Act. Like sham state court charges, however, bogus delays by foreign authorities can be policed with due process claims.

2. *Sixth Amendment*

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. Unlike the regimented Speedy Trial Act, the constitutional speedy-trial right "is amorphous, slippery, and necessarily relative. It is consistent with delays and dependent upon circumstances." Vermont v. Brillon, 129 S. Ct. 1283, 1290 (2009) (citations, internal quotation marks, and brackets omitted). Instead of imposing a specific timeline that would govern all trials, the Supreme Court applies a balancing test. See Barker v. Wingo, 407 U.S. 514, 523, 530 (1972). That test weighs "four separate enquiries: whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." Doggett v. United States, 505 U.S. 647, 651 (1992) (citing Barker, 407 U.S. at 530). The Speedy Trial Clause is not engaged until a defendant is "accused" by "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge." United States v. Marion, 404 U.S. 307, 320 (1971). The remedy for a violation of the Speedy Trial Clause is dismissal with prejudice. See Barker, 407 U.S. at 522.

There are four periods of time potentially involved in this inquiry: Homaune's time in Iran after the Government filed the Sealed Criminal Complaint (and soon thereafter obtained an

arrest warrant) on October 28, 2010, his arrest in Turkey in August 2011, his return to Iran between August 2011 and May 2012, and his final arrest and extradition from Germany in May and June 2012.  Here, Homaune focuses on the Government's failure to extradite him from Turkey when he was detained by Turkish officials in August 2011, which followed the 2010 Complaint.  He accepts that the Government had no way to bring him to trial while he was in Iran.  And since Homaune's German detention, proceedings have moved swiftly.

As a preliminary matter, the Complaint here may well not trigger the Sixth Amendment.  A criminal complaint is not as formal an accusation as an information or indictment, and the Government filed this Complaint against Homaune under seal.  The Complaint therefore imposed "no restraints on his liberty" and did not make him "the subject of public accusation." Marion, 404 U.S. at 321.  Because no precedent definitively resolves the issue, however, the Court will assume for purposes of its analysis that the Complaint does trigger the Sixth Amendment speedy-trial right.

In moving now to an analysis of the four Barker factors, the Court finds that while two weakly favor Homaune, the other two strongly – overwhelmingly – favor the Government.  The Court consequently concludes that, at least at this point, there has been no violation of the Sixth Amendment speedy-trial right.

The first Barker factor – whether the delay before trial was uncommonly long – "is actually a double enquiry." Doggett, 505 U.S. at 651.  First, to trigger the speedy-trial analysis, a defendant must allege an abnormally long delay "since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." Id. at 652.  Courts sometimes call this trigger a "presumptively prejudicial" delay.  See id.  Other circuits have generally found a delay exceeding one year to be

"presumptively prejudicial," and the D.C. Circuit has not questioned that rule of thumb.  See United States v. Taylor, 497 F.3d 673, 677 (D.C. Cir. 2007).  The second half of the inquiry considers, "as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim."  Doggett, 505 U.S. at 652.  How much delay is tolerable is "dependent upon the peculiar circumstances of the case.  To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."  Barker, 407 U.S. at 530-31 (footnote omitted).

Here, the Government filed its Complaint and obtained an arrest warrant almost two years ago, making the delay "presumptively prejudicial."  As mentioned earlier, however, the Complaint was initially under seal, imposing no hardship at all on Defendant, and he was not arrested until August 2011.  Measuring from either date yields a delay little "beyond the bare minimum needed to trigger judicial examination of the claim."  Doggett, 505 U.S. at 652; cf. id. (delay of eight-and-a-half years).  This is an international case spanning four countries across three continents; it is not surprising that this prosecution takes longer than "an ordinary street crime."  At this point, if the length of delay helps Homaune, it is only by the barest of margins.

Second, the Court must consider who is more to blame for the delay.  "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government."  Barker, 407 U.S. at 531.  On the other hand, a "more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."  Id.  Last, "a valid reason, such as a missing witness, should serve to justify appropriate delay."  Id.

Here, the delay seems to be mainly justified. A missing defendant – even more than a missing witness – excuses delay. Homaune was certainly missing and beyond the reach of American law enforcement while he was in Iran. Indeed, in <u>Doggett</u> the Court implied that delay may always be appropriate while the defendant is living abroad. <u>See</u> 505 U.S. at 652-53 (government negligent when its investigators "made no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him within minutes").

The Government claims to have an airtight defense for the week when Homaune was in Turkey: it points out that 18 U.S.C. § 1204 is not an extraditable offense. The Extradition and Mutual Assistance in Criminal Matters treaty between the United States and Turkey governs extradition between the two countries. <u>See</u> June 7, 1979, 32 U.S.T. 3111. Among other things, that treaty requires each country to extradite defendants accused of "extraditable offenses," which includes listed offenses "punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty." <u>Id.</u> at art. 2(1), 32 U.S.T. at 3114-15. According to the Government, the equivalent offense in Turkey – Article 234 of the Turkish Penal Code – allows punishment only <u>up to</u> one year, and thus § 1204 does not satisfy the treaty. The Government even pursued extradition, contacting Turkish officials in August 2011, who agreed that Article 234 generally carries a maximum sentence of one year. <u>See</u> Def. Speedy Trial Reply, Exh. 1. Yet, there is reason to think that the Government misunderstood the potential sentence here. Neither party provided the Court with a copy of Article 234. <u>Cf.</u> Fed. R. Crim. P. 26.1 ("A party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice."). From the Court's own research, however, it appears that the maximum punishment doubles if a child is under 12

(as M.H. was here), meaning that the maximum punishment was two years and extradition was possible. So while the Government attempted extradition, its attempt may have been marred by error by both countries.

Even if the Court's understanding of Article 234 is correct, however, Homaune is clearly far more at fault for the delay than the Government. His brief venture into Turkey cannot hide the primary reason for delay here: Homaune was living abroad in Iran, one of the few spots on Earth that the U.S. Government cannot easily reach. The reason for the delay thus weighs heavily in the Government's favor.

Third, the Court must consider whether Homaune has asserted his right to a speedy trial in due course. Here, Homaune claims (and the Government accepts) that he was not told about the charges against him until May 2012. He has vigorously and repeatedly asserted his speedy-trial right since his extradition in late June 2012. Those recent efforts support his case. Delay since May or June 2012, however, has been minimal; it is the time before extradition, when Homaune could not assert his speedy-trial rights, that accounts for most of the lag. So while Homaune's assertion of his speedy-trial right counts in his favor, it carries little weight.

The final Barker factor is prejudice. Barker names three kinds of prejudice: "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the defense will be impaired." 407 U.S. at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id. When the Government has pursued a defendant "with reasonable diligence from his indictment to his arrest," his Speedy Trial Clause claim will generally fail – "however great the delay" – unless he can show "specific prejudice to his defense." Doggett, 505 U.S. at 656.

Here, Homaune alleges no specific prejudice at all. Nor could he. He was neither imprisoned nor aware of the charges until at least May 2012. That length of pretrial incarceration and anxiety is nothing out of the ordinary. This Court, in fact, set trial for September 18, 2012, but subsequently granted a <u>defense</u> motion to continue so Homaune could obtain foreign deposition testimony. There is also no hint that his defense here could be impaired. Instead of claiming prejudice, Homaune argues that the delay after accusation exceeded one year, and he therefore suffered "presumptive prejudice." That argument, however, confuses the "presumptive prejudice" necessary to trigger the speedy-trial inquiry with the prejudice prong of the <u>Barker</u> test. Indeed, the Supreme Court has warned against this very mistake: "[A]s the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the <u>Barker</u> enquiry." <u>Doggett</u>, 505 U.S. at 652 n.1. The prejudice prong here decisively favors the Government.

In sum, the Government pursued Homaune with reasonable diligence, and he has shown no specific prejudice. Those two facts more than offset the length of the delay and Homaune's persistent assertion of his speedy-trial rights.

In a last-ditch attempt to get the Indictment tossed, Homaune claims that his prosecution violates the Fifth Amendment Due Process Clause because it follows a delay intentionally manufactured by the Government "to gain tactical advantage over the accused" that caused him "actual prejudice." <u>Marion</u>, 404 U.S. at 323. Contrary to those claims, however, the Government never intentionally delayed the proceedings here; it tried for extradition at every turn. Nor has Homaune suffered prejudice; indeed, his brief makes no specific allegations. Like his other protests, Homaune's Due Process Clause objection fails.

**III.     Conclusion**

For the reasons set forth above, the Court will deny Defendant's Motions in a separate

Order to be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 15, 2012